**ENPRO SYSTEMS, LTD., Plaintiff,**

v.

**NAMASCO CORP., et al., Defendants.**

**No. CIV.A. H–03–2412.**

United States District Court,
S.D. Texas,
Houston Division.

Feb. 10, 2005.

John F. Luman, III, Bracewell & Patterson LLP, Lester L Hewitt, Akin Gump et al., Houston, TX, for Enpro Systems Ltd., Plaintiff.

Brooke F. Voelzke, Hunton & Williams LLP, Atlanta, GA, David Preston Poole, Hunton & Williams, Dallas, TX, Rick Lee Oldenettel, Oldenettel & Dies, Houston, TX, Sylvia King Kochler, Hunton & Williams LLP, William M Ragland, Jr., Attorney at Law, Atlanta, GA, Victor L. Harris, Victor L. Harris & Associates, Sugar Land, TX, for Namasco Corporation, Nucor Corporation, Defendants.

### MEMORANDUM AND ORDER

LAKE, District Judge.

Plaintiff, Enpro Systems, Ltd., brings this action against defendants, Namasco Corp. and Nucor Corp. Enpro claims breach of contract against Namasco and breach of express and implied warranties against both defendants. Pending before the court are (1) Defendant Namasco Corporation's Motion for Summary Judgment (Docket Entry No. 39), (2) Plaintiff Enpro Systems, Ltd.'s Motions for Summary Judgment (Docket Entry No. 42), and (3) Defendant Nucor Corporation's Motion for Summary Judgment (Docket Entry No. 47). For the reasons discussed below, both defendants' motions will be denied, and Enpro's motions will be granted in part.

### I. Factual and Procedural Background

On July 19, 2001, Enpro, a manufacturer of pressure vessels, placed an order for steel plate with the Houston office of Na-

masco, a supplier of steel plate. Namasco obtained the plates from Nucor, a manufacturer of rolled steel plate. The steel plates arrived at Enpro's receiving department in Channelview, Texas, on July 23, 2001—the day, according to an accompanying delivery ticket, that Enpro "wanted" the order.[1] This case involves alleged defects eventually found in one of the plates.

Enpro used the plate in question to fabricate a pressure vessel section for Valero Texas City Refinery. Enpro alleges that it inspected the steel upon delivery and repeatedly thereafter but that the defects were not discovered until mid-April of 2002, when inspectors at Valero observed visible cracks in the plate during welding of vessel component parts. After the plate was tested and Valero insisted that it be replaced, Enpro fabricated a new vessel section with another plate.

An April 18, 2002, fax reflects that Enpro notified Namasco of a "nonconformance report" it had received from a customer.[2] In an April 30, 2002, memorandum, Tizzy Hillhouse, the Namasco account manager who had completed the sales order, informed George McHale of Namasco that Enpro "wants us to credit them for the plate, the testing charges and both their own extra labor for refabricating the component and for the back

charges they are incurring from Valero."[3] She asked McHale to "initiate a claim with Nucor and let me know what their reaction is."[4] Nucor's sales supervisor, Jeff Whiteman, replied to McHale in a May 16, 2002, e-mail that "we will accept the claim for the value of the plate—1 pc."[5] Whiteman recalls hearing from Namasco on April 30, 2002, but states that Nucor had no direct contact with Enpro before receiving the original petition in this lawsuit in June of 2003.

In its invoice to Namasco, Nucor disclaimed all warranties, except that products conform to specifications, and prescribed the exclusive remedy for nonconforming goods as replacement or refund.[6] However, Nucor also provided Namasco with a "Mill Test Report" ("MTR") for the steel. The MTR states: "We hereby certify that the contents of this report are accurate and correct. All test results and operations performed by the material manufacturer are in compliance with the applicable specifications."[7] The specification for the steel plate includes the letters "PVQ,"[8] representing "pressure vessel quality." When Enpro placed its order with Namasco, it demanded that MTRs accompany the steel. Enpro's July 19,

---

1. Namasco Delivery Ticket, Exhibit 5, attached to Plaintiff Enpro Systems, Ltd.'s Motions for Summary Judgment, Docket Entry No. 42.

2. April 18, 2002, Fax from Mike Walker to Namasco, Exhibit D, attached to Enpro System, Ltd.'s Opposition to Defendant Nucor Corporation's Motion for Summary Judgment, Docket Entry No. 52.

3. April 30, 2002, Memorandum from Tizzy Hillhouse to George McHale, Exhibit F, attached to Enpro System, Ltd.'s Opposition to Defendant Nucor Corporation's Motion for Summary Judgment, Docket Entry No. 52.

4. Id.

5. May 16, 2002, E-mail from Jeff Whiteman to George McHale, Exhibit G, attached to Enpro System, Ltd.'s Opposition to Defendant Nucor Corporation's Motion for Summary Judgment, Docket Entry No. 52.

6. Nucor's Invoice, at Affidavit of Jeffrey T. Whiteman, Exhibit 1, attached to Memorandum of Law in Support of Defendant Nucor Corporation's Response to Plaintiff Enpro Systems, Ltd.'s Motion for Summary Judgment, Docket Entry No. 61.

7. Mill Test Report, Exhibit 8, attached to Plaintiff Enpro Systems, Ltd.'s Motions for Summary Judgment, Docket Entry No. 42.

8. See id.

2001, purchase order states: "Legible MTR's required with shipment, or materials subject to rejection at time of delivery;"[9] Namasco's internal sales order bears the notation "MTR's w/truck;"[10] and the Namasco delivery ticket that accompanied the shipment of steel plate to Enpro contains a signed acknowledgment that Enpro received the MTRs with the order.[11]

Like Nucor, Namasco attempted to limit potential liability by including terms in documents sent to its customers. The reverse side of the delivery ticket contains terms of a "sales agreement" that include (1) disclaimer of express and implied warranties; (2) disallowance of claims for labor, cartage, or other consequential or direct damages; (3) a remedy limited to replacement or credit for defective items; and (4) a ten-day claims limitations period commencing with billing.[12] Namasco's July 23, 2001, invoice, which Enpro received on July 26, references this sales agreement and reasserts the disclaimer of express and implied warranties.[13]

Enpro and Namasco did not discuss terms and conditions or any "sales agreement" when Enpro placed the order on July 19, but the back of the delivery ticket states that agreements and orders are not effective until delivery or written acceptance.[14] Namasco had done business with Enpro since 1986, and Enpro made 34 purchases between August of 2000 and July 19, 2001, alone. Although Namasco had used the same documentation since 2000, Enpro did not object to the terms and conditions on the Namasco delivery tickets or invoices. Enpro also contends (over Namasco's denial) that it had sent Namasco purchase orders containing its own terms and conditions before it decided, sometime in 2000, to mail its vendors a general notice of such terms and conditions. Enpro further claims that its purchasing department would not have seen the Namasco delivery tickets.

Namasco alleges that it is the custom and practice in the steel industry to disclaim warranties, exclude liability for consequential damages, and limit remedies for nonconforming products to replacement or refund. Enpro does not agree that such disclaimers and limitations apply to products with defects that are not detectable upon delivery, and it cites previous instances in which it requested and received from vendors' compensation beyond the cost of replacement.

Enpro filed this lawsuit in 2003 in Texas state court. It was removed to this court in July of 2003. The parties have agreed to stay the case pending the court's rulings on the pending motions for summary judgment.

## II. *Standard of Review*

An order granting summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

---

9. July 19, 2001, Purchase Order Confirmation to Tizzy Hillhouse, Exhibit 4, attached to Plaintiff Enpro Systems, Ltd.'s Motions for Summary Judgment, Docket Entry No. 42.

10. Sales Order, Exhibit 3, attached to Plaintiff Enpro Systems, Ltd.'s Motions for Summary Judgment, Docket Entry No. 42.

11. Namasco Delivery Ticket, Exhibit 5, attached to Plaintiff Enpro Systems, Ltd.'s Motions for Summary Judgment, Docket Entry No. 42.

12. *Id.*

13. Namasco's Invoice, Exhibit 9, attached to Plaintiff Enpro Systems, Ltd.'s Motions for Summary Judgment, Docket Entry No. 42.

14. Namasco Delivery Ticket, Exhibit 5, attached to Plaintiff Enpro Systems, Ltd.'s Motions for Summary Judgment, Docket Entry No. 42.

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A "genuine" dispute over a fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* In considering a summary judgment motion the court is to resolve any doubts and draw any inferences in favor of the nonmoving party. *Evans v. City of Houston,* 246 F.3d 344, 348 (5th Cir.2001).

Summary judgment may be granted, upon motion and after an adequate period for discovery, against a party who has failed to make a sufficient showing establishing the existence of an element essential to the party's case and as to which the party bears the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party moving for summary judgment has the "initial responsibility of informing the district court of the basis for its motion" and "identifying those portions of [the record], which it believes demonstrate the absence of a genuine issue of material fact." *Id.,* 106 S.Ct. at 2553. If this burden is met, the nonmoving party must respond by going outside the pleadings and pointing to facts that indicate a "genuine issue for trial." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994). The nonmoving party must do more than rest on " 'some metaphysical doubt,' " " 'conclusory allegations,' " " 'unsubstanti-ated assertions,' " or a mere " 'scintilla' " of evidence. *Id.* at 1075 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 110 S.Ct. 3177, 3180, 111 L.Ed.2d 695 (1990), *Hopper v. Frank,* 16 F.3d 92 (5th Cir.1994), *Davis v. Chevron USA, Inc.,* 14 F.3d 1082 (5th Cir. 1994)). Instead, the party opposing summary judgment must respond by "tendering depositions, affidavits, and other competent evidence," *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.1992).

### III. Analysis

#### A. Enpro and Namasco

Enpro asserts claims against Namasco for breach of contract, breach of express warranty, and breach of the implied warranties of merchantability and fitness for a particular purpose.[15] In its motion for summary judgment Namasco argues that the terms contained in the delivery ticket's "sales agreement" and on the invoice, including the disclaimer of warranties, the limitation of liability, and the ten-day claim limitations period, were part of the contract for sale of the steel plate and therefore bar Enpro's claims.[16] In its own motions for summary judgment Enpro argues that the delivery ticket/invoice terms constitute neither an offer nor an acceptance and did not otherwise become part of the contract either as proposed additional terms or through the parties' course of dealing or usage of trade.[17]

##### 1. Contract Formation

■ Namasco's acceptance of Enpro's order occurred before Enpro's receipt of

**15.** First Amended Complaint, Docket Entry No. 48.

**16.** Memorandum of Law in Support of Defendant Namasco Corporation's Motion for Summary Judgment, Docket Entry No. 40.

**17.** Plaintiff Enpro Systems, Ltd.'s Motions for Summary Judgment, Docket Entry No. 42; Plaintiff Enpro Systems, Ltd.'s Reply to Defendant Namasco Corporation's Memorandum in Opposition to Plaintiff's Motions for Summary Judgment, Docket Entry No. 68.

the delivery ticket and the invoice. Texas's statutory incorporation of the Uniform Commercial Code provides that in the absence of unambiguous indication by the language or circumstances "an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or non-conforming goods." Tex. Bus. & Com. Code § 2.206(a)(2). The July 19, 2001, purchase order confirmation and sales order form, which together identify quantities of steel plate of specified dimensions to be delivered to Enpro within days, evidence Enpro's placement of an order for prompt shipment.

Namasco's account manager denies ever making any promises to her Enpro counterpart that the order would be filled,[18] and Namasco argues that the account manager had no authority to do so and that the internal sales order form did not constitute acceptance of the order.[19] If true, this might suggest the parties' contract was not complete on the day the order was placed. But under the Texas UCC, these facts would still reflect that contract formation occurred when Namasco accepted the offer by shipping the steel plate on July 23, 2001, before Enpro had any opportunity to review the delivery ticket/invoice terms.

Urging that the delivery ticket and invoice operate as the acceptance, Namasco relies on the statement, found among the terms of the delivery ticket "sales agreement," that "agreements and orders become effective when, and only when, accepted in writing by us or by delivery of the particular goods ordered."[20] Namasco also notes that Enpro's purchase order contained "only the basic terms of the proposed transaction," such as price, grade, quantity, and delivery date, "but was not accompanied by any terms or conditions."[21] Neither of these facts persuades the court.

■ Probably as early as the moment the steel left Namasco for shipment to Enpro, and certainly by the time it arrived at Enpro's receiving department—before any Enpro employee could have seen the delivery ticket purporting to delay acceptance—each party had an enforceable contract against the other. The purchase order confirmation and the internal sales order form satisfy Texas's statute of frauds requirement, for the two writings, each authenticated by the employees handling the order for the respective companies,[22] are "sufficient to indicate that a contract for sale has been made between

**18.** Supplemental Affidavit of Martha L. Hillhouse, at ¶¶ 4–8, Exhibit C, attached to Defendant Namasco Corporation's Memorandum in Opposition to Plaintiff's Motions for Summary Judgment, Docket Entry No. 57.

**19.** Defendant Namasco Corporation's Memorandum in Opposition to Plaintiff's Motions for Summary Judgment, Docket Entry No. 57, p. 4.

**20.** *See id.* at 5; Memorandum of Law in Support of Defendant Namasco Corporation's Motion for Summary Judgment, Docket Entry No. 40, p. 11 (quoting Sales Agreement, Tab 2 to Affidavit of Martha L. Hillhouse, Exhibit A, attached thereto).

**21.** Memorandum of Law in Support of Defendant Namasco Corporation's Motion for Summary Judgment, Docket Entry No. 40, p. 11.

**22.** See July 19, 2001, Purchase Order Confirmation to Tizzy, Exhibit 4, attached to Plaintiff Enpro Systems, Ltd.'s Motions for Summary Judgment, Docket Entry No. 42; Sales Order, Exhibit 3, attached to Plaintiff Enpro Systems, Ltd.'s Motions for Summary Judgment, Docket Entry No. 42. The sales order bears the hand-written initials "TZ" for "salesman."

the parties" when considered alongside the fact of shipment. *Id.* § 2.201(a); *see also id.* § 2.201 cmt. 1 (stating "[a]ll that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction"). Further, the "basic terms," as Namasco calls them, are more than enough to constitute an offer whose acceptance via § 2.206(a)(2) (quoted above) could create a contract. The code, with the many "gap-fillers" that provide, e.g., reasonable price terms when price is not otherwise settled, § 2.305(a), and implied warranties when they are not expressly excluded, § 2.314–315, does not predicate legal recognition of a contract on the parties' formal discussion of "terms and conditions" or their exchange of documents containing boilerplate language.

■ There is an additional reason why the Namasco documents cannot be deemed part of the offer and acceptance in this case. Even were the court to assume that the contract was not completed by Namasco's shipment of the steel, it certainly was complete before an appropriate Enpro employee could view the sales agreement or invoice terms. In a sworn declaration Enpro's president and CEO, John Painter, states that while employees in the receiving department inspect deliveries for defects, no one there is authorized to agree to terms and conditions of contract.[23]

Moreover, according to Painter, the receiving department would have conveyed the delivery ticket to the accounting department—not to the purchasing department or the employee who placed the order in the first place.[24] Based on an Enpro time stamp, the invoice did not arrive at Enpro until July 26, 2001,[25] three days after delivery. Before then an enforceable contract had arisen between the parties. The Texas UCC states that "[c]onduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale," and the buyer's acceptance of the goods obviates any writing requirement under the statute of frauds. *See id.* §§ 2.207(c), 2.201(c)(3). The purchase order, the shipment of the specified steel, Enpro's receipt of the steel,[26] and Namasco's preparation of an invoice, taken together, persuade the court that there was an enforceable contract before anyone with proper authority at Enpro had occasion to view the delivery ticket/invoice terms.

Because this conclusion does not entitle Enpro to summary judgment that the parties entered into an agreement on July 19, 2001, Enpro's Motion for Summary Judgment No. 1 will be denied.[27] Likewise, Namasco's Motion for Summary Judgment—that the delivery ticket, sales agreement, and invoice constituted accep-

**23.** Declaration of John R. Painter, at ¶ 5, Exhibit C, attached to Plaintiff's Enpro Systems, Ltd.'s Opposition to Defendant Namasco Corporation's Motion for Summary Judgment, Docket Entry No. 53.

**24.** *Id.* at ¶ 6.

**25.** Namasco's Invoice 77723, Exhibit 9, attached to Plaintiff Enpro Systems, Ltd.'s Motions for Summary Judgment, Docket Entry No. 42.

**26.** According to Painter's declaration, employees at Enpro's receiving department would have inspected the steel upon delivery.

See Declaration of John R. Painter, at ¶ 5, Exhibit C, attached to Plaintiff's Enpro Systems, Ltd.'s Opposition to Defendant Namasco Corporation's Motion for Summary Judgment, Docket Entry No. 53. Although Enpro did not immediately "signif[y] to the seller that the goods are conforming," Tex. Bus. & Com. Code § 2.606(a)(1), the evidence nevertheless confirms that it "fail[ed] to make an effective rejection" of the steel after "reasonable opportunity to inspect" it at delivery, *id.* § 2.606(a)(2).

**27.** Plaintiff Enpro Systems, Ltd.'s Motions for Summary Judgment, Docket Entry No. 42, pp. 5–10.

tance of Enpro's offer and are therefore part of the contract—will also be denied.[28]

### 2. § 2.207

■ Namasco relies on § 2.207 of the Code to argue that the disclaimer and limitation of liability terms contained in the delivery ticket sales agreement and the invoice were "proposals for addition to the contract."[29] *Id.* § 2.207(b). Such proposals can be found in a "definite and seasonable expression of acceptance or a written confirmation" sent to the other party, *id.* § 2.207(a), and they become part of a contract between merchants unless the offer expressly limits acceptance to the terms of the offer, the additional terms materially alter the contract, or the other party objects to the terms, *id.* § 2.207(b). In this case, the court need not consider whether the extra terms became part of the contract because the delivery ticket and invoice were not documents that could propose additional terms in the first place.

As the court has just explained, neither the delivery ticket nor the invoice acted as an acceptance. An enforceable contract existed before these documents could even have come to the attention of relevant Enpro employees.

The documents were also not written confirmations. In support of its position, Namasco cites the factually analogous decision in *Waukesha Foundry v. Industrial Engineering,* 91 F.3d 1002, 1007–09 (7th Cir.1996).[30] There, the court concluded that a packing slip and invoice sent to a buyer subsequent to contract formation were "written confirmations" whose terms, according to the circumstances of the case, became part of the parties' contract under § 2–207 of the UCC. *See id.* at 1007–09. Much like the present case, the parties in *Waukesha Foundry* had an ongoing relationship in which the buyer placed orders for steel castings and faxed confirming purchase orders, and the seller responded by manufacturing the castings and shipping them to the buyer with an enclosed packing slip with an invoice following thereafter. *Id.* at 1003.

*Waukesha Foundry's* value as persuasive precedent is limited. The court did not elaborate on its reasoning for concluding that the packing slip and invoice were written confirmations of what was, it emphasized, a completed contract. *See id.* at 1007. However, a year later in *Echo, Inc. v. Whitson Co.,* 121 F.3d 1099 (7th Cir. 1997) (applying Illinois law), the Seventh Circuit did consider the question of how a "confirmation"—which presumes the existence of a completed contract between the parties—can "operate[ ] 'as an acceptance'" (whose terms, even though additional or different from those already agreed upon, may be included in the contract) under UCC § 2–207. *Id.* at 1103. The court concluded that "[w]hat the UCC must mean here is that the confirmation makes the agreement legally enforceable." *Id.* Recalling the statute of frauds, the court suggested that a § 2–207 written confirmation is a document that turns "an oral or informal agreement into a legally-binding contract." *Id.* at 1103–04.

In defining a UCC § 2–207 written confirmation, the Seventh Circuit quoted from another case cited by Namasco, the Fifth Circuit's decision in *Mid–South Packers, Inc. v. Shoney's, Inc.,* 761 F.2d 1117, 1123 (5th Cir.1985).[31] *See Echo, Inc.,* 121 F.3d

---

**28.** Memorandum of Law in Support of Defendant Namasco Corporation's Motion for Summary Judgment, Docket Entry No. 40, pp. 10–11.

**29.** *See, e.g.,* Defendant Namasco Corporation's Memorandum in Opposition to Plain-

tiff's Motions for Summary Judgment, Docket Entry No. 57, pp. 10–16.

**30.** *Id.* at 13–15.

**31.** *Id.* at 13.

at 1104. Observing that Mississippi's version of § 2–207—which is identical to Texas's—"applies to the situation in which an agreement has been previously reached either orally or by informal writings, and one or both parties send written confirmation of terms discussed, adding certain terms not discussed," the Fifth Circuit stated that "[t]he written confirmation is recognized primarily as a writing necessary to satisfy the statute of frauds when the agreement reached is at least partially unenforceable for lack of a writing; this appears to be the primary basis for permitting a written confirmation to act as an acceptance." *Id.* at 1123.

As the court explained above, in this case the delivery ticket and invoice were not needed in order to bring the parties' bargain into compliance with the statute of frauds. If the two documents memorializing the order did not satisfy the writing requirement, Enpro's apparent acceptance of the goods upon delivery effectively waived that requirement. Under either scenario the contract was enforceable before the delivery ticket or invoice could come to the attention of the proper Enpro employees.

There is an additional reason the delivery ticket and invoice are not written confirmations under Texas's code. As Enpro argues and the court has recognized, Namasco conveyed the delivery ticket to Enpro's receiving department—not to the purchasing department or the employee who placed the order.[32] Under § 1.202(f), the delivery ticket's terms could be effective, if at all, only from the "time it is brought to the attention of the individual conducting that transaction and, in any event, from the time it would have been brought to the individual's attention if the organization had exercised due diligence." TEX. BUS. & COM. CODE § 1.202(f). The Code explains that "[d]ue diligence does not require an individual acting for the organization to communicate information unless the communication is part of the individual's regular duties or the individual has reason to know of the transaction and that the transaction would be materially affected by the information." *Id.* According to Enpro procedure, the receiving department forwarded the delivery ticket to accounting.[33] In this case Namasco could not be certain that the ticket would ever make its way to the purchasing department that placed the order or that Enpro would otherwise be deemed to have effective notice of the terms contained thereon. The court hesitates to credit such a writing as the kind of "formal memorand[um]" one contracting party sends to another as written confirmation of an oral or informal agreement. *See id.* § 2.207 cmt. 1.

As for the Namasco invoice, it is questionable whether an invoice sent by one party to another after contract formation qualifies under Texas law as a § 2.207 written confirmation. In *Preston Farm & Ranch Supply, Inc. v. Bio–Zyme Enterprises*, 625 S.W.2d 295 (Tex.1981), the Texas Supreme Court stated:

> The basic contract for the sale of goods had already been formed and executed.
>
> Courts and scholars have questioned whether this section [2.207] can apply at all to a sale in which the goods have already been shipped and accepted and a memorandum such as an invoice or statement altering the terms is sent contemporaneously with or subsequent to

---

**32.** Plaintiff's Enpro Systems, Ltd.'s Opposition to Defendant Namasco Corporation's Motion for Summary Judgment, Docket Entry No. 53, pp. 8–10.

**33.** See Declaration of John R. Painter, at ¶ 6, Exhibit C, attached to Plaintiff's Enpro Systems, Ltd.'s Opposition to Defendant Namasco Corporation's Motion for Summary Judgment, Docket Entry No. 53.

the shipment of the goods. [citations omitted] "Certainly, not every written communication after an oral agreement need be characterized as a confirmation. Were it otherwise, it would be impossible to determine where the process of confirming ended." [citations omitted] We hold that the process of acceptance and confirmation to which section 2.207 is addressed stops short of a monthly statement sent after the goods have been shipped.

*Id.* at 299–300. Although this holding does not necessarily apply to the current·facts, the court is nevertheless mindful of the Supreme Court's obvious caution in characterizing post-contract writings as confirmations. In view of the other factors discussed above, the Texas Supreme Court would likely avoid such a characterization in this case.

The court concludes as a matter of law that neither the Namasco delivery ticket nor the Namasco invoice is a written confirmation whose additional terms are eligible for inclusion in the contract under § 2.207. This contravenes any suggestion by Namasco that they are written confirmations, and combined with the court's conclusion in Part A–1, means that Enpro is entitled to summary judgment on its Motion for Summary Judgment No. 2— that Namasco's "attempted disclaimers of July 23 through the delivery ticket and invoice are ineffective." [34]

### 3. *The Parties' Course of Dealing*

 Although the delivery ticket and invoice were neither part of the offer and acceptance nor written confirmations proposing additional terms, the parties' prior course of dealing may nevertheless estab-lish that the terms contained in the delivery ticket and the invoice were part of the parties' agreement. Namasco cites its consistent use of identical procedures and documents throughout a sales relationship with Enpro that dates to 1986.[35] Despite this evidence the court is not persuaded that the parties' course of dealing in this case gave rise to an implied agreement regarding the disclaimer and other terms.

Under Texas law a course of dealing— defined as a "sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct"—"may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement." TEX. BUS. & COM. CODE §§ 1.303(b), 1.303(d). Course of dealing may also exclude or modify an implied warranty. *Id.* § 2.316(c)(3). In *Preston Farm & Ranch Supply, Inc.* the Texas Supreme Court held that a buyer's continued purchases and payment of all charges for over a year, despite monthly statements conspicuously showing that a service charge was being imposed, was a course of conduct that gave rise to an implied agreement to pay the charge. 625 S.W.2d at 298. The present case differs, however, in that Enpro's mere silence regarding the delivery ticket/invoice terms— terms to which Enpro has no obligation to voice objection under § 2.207—does not provide a "common basis of understanding" in the way that affirmative conduct, like actually paying a service charge, does.

---

**34.** Plaintiff Enpro Systems, Ltd.'s Motions for Summary Judgment, Docket Entry No. 42, pp. 10–12.

**35.** Memorandum of Law in Support of Defendant Namasco Corporation's Motion for Summary Judgment, Docket Entry No. 40, p. 9 (citing Affidavit of Martha L. Hillhouse, at ¶ 5, Exhibit A, attached thereto).

Namasco cites cases from other jurisdictions that appear to support a contrary conclusion.[36] In *Ins. Co. of N. Am. v. NNR Aircargo Service, Inc.*, 201 F.3d 1111 (9th Cir.2000), the Ninth Circuit, applying California law, held that "invoice terms and conditions may supplement shipping agreements if there has been a sufficient course of dealing." *Id.* at 1113. The court concluded that the receipt of identical invoices on 47 prior occasions constituted such a course of dealing, from which knowledge of the terms could be presumed. *Id.* at 1115.

Nevertheless, this court is convinced that Texas law requires more substantial evidence of parties' shared understanding in order to prove course of dealing. In *Tubelite v. Risica & Sons, Inc.*, 819 S.W.2d 801 (Tex.1991), a case involving facts similar to those of *Preston Farm & Ranch Supply, Inc.*, the Texas Supreme Court stated that an implied agreement, whether arising under the common law or the UCC's course of dealing provision, is one in which the acts of the parties indicate a mutual intention to contract. *Id.* at 804 (quoting *Preston Farm & Ranch Supply, Inc.*, 625 S.W.2d at 298). The Court stated that "[a]cquiescence to the contract by the party to be charged may be implied from his *affirmative actions....* " *Id.* at 805 (emphasis added). Citing another decision interpreting *Preston Farm & Ranch Supply, Inc.*, the Court explained that the "mere failure to object to the unilateral charging of interest, without more, does not establish an agreement to pay interest between the parties." *Id.* (citing *Triton Oil & Gas Corp. v. Marine Contractors & Supply, Inc.*, 644 S.W.2d 443, 445 (Tex. 1982)). Partial payments made by the de-

fendant after the plaintiff added interest charges to the account statements did not constitute evidence of an agreement to pay those charges, because one could infer the plaintiff made the payments simply to satisfy the principal amount due. *Id. See also Triton Oil & Gas Corp.*, 644 S.W.2d at 445–46 (stating that even though the plaintiff deducted interest charges from the defendant's share of proceeds and the defendant did not complain, "[t]here was no evidence of any conduct by [the defendant] indicating its acceptance of those terms" because the defendant did not pay the charges or receive the proceeds).

Enpro's position is analogous to the *Tubelite* defendant's. Although it never expressly objected to the delivery ticket and invoice terms, it also never signaled clear acquiescence to their imposition. Namasco's account manager acknowledges that she never discussed terms and conditions with her Enpro counterpart, because "we furnished [them] with every shipment." [37] The delivery ticket contains blanks for signatures representing that the buyer received the order and accompanying MTRs, but it includes no place for an authorization communicating assent to, or even knowledge of, the terms contained on the reverse.[38] There is nothing in the record suggesting Enpro ever affirmatively accepted or recognized the terms—for example, by tolerating them in a previous dispute—and then continued to purchase steel from Namasco under the same procedures. These facts do not persuade the court that there was, as a matter of law, a "common basis of understanding" between the parties as to the delivery ticket/invoice terms or that Enpro, through affirmative

**36.** See Reply Brief in Support of Defendant Namasco Corporation's Motion for Summary Judgment, Docket Entry No. 67, pp. 6–7.

**37.** Deposition of Martha L. Hillhouse, at p. 64, lines 14–24, Attachment A to Plaintiff En-

pro Systems, Ltd.'s Motions for Summary Judgment, Docket Entry No. 42.

**38.** See Delivery Ticket, Exhibit 5, attached to Plaintiff Enpro Systems, Ltd.'s Motions for Summary Judgment, Docket Entry No. 42.

conduct, impliedly agreed to their imposition. Namasco's Motion for Summary Judgment as to the parties' course of dealing will therefore be denied.

### 4. *Usage of Trade*

■ Namasco also argues that custom and practice in the steel industry establishes the disclaimer of warranties, exclusion of consequential damages, and limitation of remedies as part of the parties' contract.[39] The Texas UCC describes a usage of trade as "any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question." TEX. BUS. & COM. CODE § 1.303(c). The "existence and scope" of this usage "must be proved as facts." *Id.* If it is so proved, usage of trade, like course of dealing, "may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement," as well as exclude or modify implied warranties. *Id.* §§ 1.303(d), 2.316(c)(3).

A Texas appeals court has explained that

> to establish custom and usage of trade there must be evidence that the custom was generally known, or had been established for a sufficient length of time to become generally known, and that it was known to all parties to the contract or that the parties had contracted with reference to it.

*Texas Gas Exploration Corp. v. Broughton Offshore Ltd. II*, 790 S.W.2d 781, 785 (Tex.App.—Houston [14th Dist.] 1990, no writ). Namasco cites the sworn statement of its Houston branch manager, Michael Regitz, who affirms, on the basis of his "extensive experience in the steel industry," that it is the "custom and practice" in industry sales transactions to disclaim warranties, exclude consequential damages, and limit liability.[40] Namasco also references Nucor sales supervisor Jeffrey Whiteman's affidavit, which contains the same custom and practice assertion,[41] and it points to the similar terms and conditions of several other steel suppliers.[42] Enpro challenges Namasco's evidence with Enpro president and CEO Painter's sworn declaration that he understood attempts by companies in the steel business to "limit warranties and remedies" as "limited to situations where defects in the delivered product were detectable upon delivery."[43] Painter asserts that the usage of trade in the "vessel fabrication industry" is such that steel vendors compensate [companies like] Enpro for consequential losses in situations where defects are not discovered

---

**39.** Memorandum of Law in Support of Defendant Namasco Corporation's Motion for Summary Judgment, Docket Entry No. 40, p. 10.

**40.** Affidavit of Michael B. Regitz, at ¶ 6, Exhibit B, attached to Memorandum of Law in Support of Defendant Namasco Corporation's Motion for Summary Judgment, Docket Entry No. 40. See Memorandum of Law in Support of Defendant Namasco Corporation's Motion for Summary Judgment, Docket Entry No. 40, p. 10.

**41.** See Reply Brief in Support of Defendant Namasco Corporation's Motion for Summary Judgment, Docket Entry No. 67, p. 7 (citing Affidavit of Jeffrey T. Whiteman, Exhibit 1, attached to Defendant Nucor Corporation's Motion for Summary Judgment, Docket Entry No. 47).

**42.** *See id.* at 7–8.

**43.** Declaration of John R. Painter, Jr., at ¶ 10, Exhibit A, attached to Plaintiff Enpro Systems, Ltd.'s Reply to Defendant Namasco Corporation's Memorandum in Opposition to Plaintiff's Motions for Summary Judgment, Docket Entry No. 68. See Plaintiff Enpro Systems, Ltd.'s Reply to Defendant Namasco Corporation's Memorandum in Opposition to Plaintiff's Motions for Summary Judgment, Docket Entry No. 68, p. 12.

prior to product use, and in support he cites instances in which Enpro requested and received compensation "for damages beyond the replacement of the material." [44] Enpro also points out that Regitz acknowledged at his deposition that he had never encountered a situation in which defects were discovered after fabrication.[45]

It is clear from the foregoing summary that the court cannot resolve this issue without weighing evidence and comparing theories of what that evidence says—tasks that must be undertaken by the fact-finder at trial.

### 5. The MTR

■ Enpro argues that Namasco created an express warranty by providing the Nucor mill test report with the steel plate order.[46] Namasco responds that the MTR could not be an express warranty because the parties never discussed the terms or contents of the MTR, Namasco made no promises regarding those terms or contents, and Enpro did not receive the MTR prior to the steel plate delivery on July 23, 2001.[47]

■ Under Texas law an express warranty is created by "any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain" or by "any description of the goods which is made part of the basis of the bargain." TEX. BUS. & COM. CODE §§ 2.313(a)(1), 2.313(a)(2).

" 'Basis of the bargain' loosely reflects the common-law express warranty requirement of reliance." Compaq Computer Corp. v. Lapray, 135 S.W.3d 657, 677 (Tex. 2004) (quoting Am. Tobacco Co. v. Grinnell, 951 S.W.2d 420, 436 (Tex.1997)). There is no requirement that the statement or description creating the warranty originate with the seller, so long as the seller " 'introduce[s] it into the bargaining process so that it becomes part of the basis of the bargain.' " Slyman v. Pickwick Farms, 15 Ohio App.3d 25, 472 N.E.2d 380, 384 (1984) (quoting Autzen v. John C. Taylor Lumber Sales, Inc., 280 Or. 783, 572 P.2d 1322, 1325 (1977)). Course of dealing and usage of trade do not affect the analysis. Texas law directs that course of dealing and usage of trade must be "construed whenever reasonable as consistent" with the express terms of an agreement, and if such a construction is not reasonable, "express terms prevail." TEX. BUS. & COM. CODE § 1.303(e).

The purchase order confirmation and sales order form belie Namasco's argument that the MTR was not part of the basis of the parties' bargain. Enpro advised that the steel was subject to rejection without accompanying MTRs, and Namasco noted on its internal form that the MTRs would be supplied at delivery. It almost defies reason to suggest that a manufacturer such as Enpro could be so concerned about MTRs as to threaten rejection without them but yet also care

---

**44.** Declaration of John R. Painter, Jr., at ¶ 12, 13, Exhibit A, attached to Plaintiff Enpro Systems, Ltd.'s Reply to Defendant Namasco Corporation's Memorandum in Opposition to Plaintiff's Motions for Summary Judgment, Docket Entry No. 68.

**45.** See Plaintiff's Enpro Systems, Ltd.'s Opposition to Defendant Namasco Corporation's Motion for Summary Judgment, Docket Entry No. 53, p. 10 (citing Deposition of Michael B. Regitz, at p. 66, lines 2–9, Exhibit B, attached thereto).

**46.** Plaintiff Enpro Systems, Ltd.'s Motions for Summary Judgment, Docket Entry No. 42, pp. 13–14.

**47.** Defendant Namasco Corporation's Memorandum in Opposition to Plaintiff's Motions for Summary Judgment, Docket Entry No. 57, pp. 16–18; Reply Brief in Support of Defendant Namasco Corporation's Motion for Summary Judgment, Docket Entry No. 67, pp. 8–9.

nothing about the contents of those MTRs. Enpro wanted an MTR that made a particular, and reliable, quality guarantee. The only reasonable conclusion from the facts is that Namasco induced Enpro to buy its products by promising—even if only by implication—that it would supply an MTR verifying the steel's "PVQ" ("pressure vessel quality") specification. Thus, the MTR created an express warranty.[48]

The court's conclusion supports Enpro's Motion for Summary Judgment No. 3, as applied to Namasco.[49] Specifically, Enpro is entitled to summary judgment that the MTR constitutes an express warranty by Namasco.

## B. Enpro and Nucor

Enpro asserts claims against Nucor for breach of express warranty and breach of the implied warranties of merchantability and fitness for a particular purpose.[50] In its motions for summary judgment, Enpro argues that the MTR constitutes Nucor's express warranty and that Nucor's attempted disclaimer and limitation of liability are ineffective against it.[51] Nucor moves for summary judgment on the grounds that it did not receive proper notice and a concomitant opportunity to cure the steel plate defects, that the warranty disclaimer and other terms contained in its

invoice to Namasco are effective against Enpro and consistent with the custom and practice of the steel industry, and that North Carolina law governs the dispute and prohibits Enpro's implied warranty claim.[52]

### 1. The MTR

■ Enpro argues that the MTR represents an express warranty by Nucor.[53] Texas law likely permits an express warranty claim against a remote manufacturer or supplier, although the question is not finally settled. *See U.S. Tire–Tech, Inc. v. Boeran, B.V.*, 110 S.W.3d 194, 198 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) (stating that "[w]e agree with the reasoning of the more recent cases and hold that privity of contract is not required in order to sustain a breach of express-warranty claim for purely economic losses"); *PPG Indus., Inc. v. JMB/Houston Centers Partners LP*, 146 S.W.3d 79, 88 (Tex.2004) (recalling an earlier holding that allowed purchasers to bring implied warranty claims against remote manufacturers and stating that "[w]hile it appears we have never addressed the same issue regarding express warranties, several lower courts have applied the same rule in that context—express warranties pass with the goods"[54]).

---

**48.** The parties do not dispute that the MTR, if it is part of the basis of the bargain, makes some kind of express warranty. See Defendant Namasco Corporation's Memorandum in Opposition to Plaintiff's Motions for Summary Judgment, Docket Entry No. 57, pp. 16–18; Reply Brief in Support of Defendant Namasco Corporation's Motion for Summary Judgment, Docket Entry No. 67, pp. 8–9.

**49.** See Plaintiff Enpro Systems, Ltd.'s Motions for Summary Judgment, Docket Entry No. 42, pp. 13–14.

**50.** First Amended Complaint, Docket Entry No. 48.

**51.** Plaintiff Enpro Systems, Ltd.'s Motions for Summary Judgment, Docket Entry No. 42, pp. 13–18.

**52.** Defendant Nucor Corporation's Motion for Summary Judgment, Docket Entry No. 47. The court has considered, but does not address, Nucor's arguments about revocation of acceptance. *See id.* at 3–5.

**53.** Plaintiff Enpro Systems, Ltd.'s Motions for Summary Judgment, Docket Entry No. 42, pp. 13–14.

**54.** The Supreme Court cited only one case, from 1979, applying the contrary rule. *See PPG Indus., Inc.*, 146 S.W.3d 79, 88 n. 36

Nucor bases its opposition to the express warranty argument on the theory that the existence of such a warranty is a fact question for the jury.[55] Nucor's reliance on various cases to support this argument is misplaced.[56] Although it is true the court concluded in *Church & Dwight Co., Inc. v. Huey*, 961 S.W.2d 560 (Tex. App.—San Antonio 1997, pet. denied), that "[a] jury could have found that an express warranty existed and was breached," the court said so in the context of a factual insufficiency challenge to a jury verdict. *Id.* at 568. Another Texas court, in *Crosbyton Seed Co. v. Mechura Farms*, 875 S.W.2d 353 (Tex.App.—Corpus Christi 1994, no writ), stated essentially the same conclusion, but its task was a "no evidence" review of an instructed verdict against an express warranty claim. *See id.* at 362. *General Supply & Equipment Co., Inc. v. Phillips*, 490 S.W.2d 913 (Tex. Civ.App.—Tyler 1972, writ ref'd n.r.e.), involved challenges that a jury finding of an express warranty was not supported by any evidence and that the jury's decision that certain statements were not mere opinion was against the overwhelming weight and preponderance of the evidence. *Id.* at 917. The court did state that "[w]hether the retailer or his agent affirmed a fact or made a promise concerning the product amounting to a warranty is usually a question of fact for the jury," but its holding was merely that the jury's finding was "amply supported by the evidence" and that the claim about the statements was also without merit. *Id.* at 917–18.

Part of the court's job in ruling on a summary judgment motion is to determine whether there is a "genuine issue as to any material fact." *See* Fed. R. Civ. Proc. 56(c). The cases cited by Nucor are not helpful in this regard. The courts' conclusions that sufficient evidence exists to support actual or possible jury findings of express warranties says nothing about the state of the evidence in this case, and there is not the slightest hint in any of those opinions—so far as this court can find—that summary judgment on an express warranty claim is per se inappropriate.

Nucor argues that there is a fact issue on reliance in this case because Enpro admits that it did not have a contract with Nucor and did not see the MTR until after its purchase.[57] The court has already dealt with the timing of Enpro's receipt of the MTR, concluding on the basis of the undisputed facts that the promise of a quality guarantee in the MTR helped induce Enpro's purchase of the steel. As to the issue of the lack of a "bargain" between Enpro and Nucor, this is a question of law on whether privity is required to recover for breach of express warranty. Nucor has not contested that "warranty claims pass with the underlying goods" under Texas law. *See PPG Indus., Inc.*, 146 S.W.3d at 92.

There is no genuine dispute of material fact regarding the MTR. Since the facts demonstrate the existence of reliance and the other necessary elements, the court will grant summary judgment that the MTR is an express warranty by Nucor.[58]

---

(Tex.2004). In support of the rule that express warranties pass with the goods the Court cited four cases, three from 1999 or later. *See id.*

55. See Memorandum of Law in Support of Defendant Nucor Corporation's Response to Plaintiff Enpro Systems, Ltd.'s Motion for Summary Judgment, Docket Entry No. 61, pp. 1–2.

56. *See id.*

57. *Id.* at 1.

58. See supra Part A–5 for discussion of what constitutes an express warranty and also for the rule that express terms prevail over usage of trade when the two cannot be reconciled.

Enpro's Motion for Summary Judgment No. 3—that the MTR is an express warranty by both Namasco and Nucor—will therefore be granted.[59]

### 2. *Notice to Nucor*

In its summary judgment motion Nucor argues that Enpro's claims are barred because it did not give Nucor timely notice and seasonable opportunity to cure the alleged defects.[60] Enpro responds that there was no opportunity to cure the defects under the circumstances, and in any event, Nucor received proper notice through Namasco.[61]

The Texas UCC provides that a buyer "must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." TEX. BUS. & COM. CODE § 2.607(c)(1). This requirement extends to buyers who wish to recover damages for breach of warranty from remote sellers or manufacturers. *Wilcox v. Hillcrest Memorial Park of Dallas*, 696 S.W.2d 423, 424–25 (Tex.App.—Dallas 1985, writ ref'd n.r.e). The purpose of the notice requirement is "to give the seller an opportunity to inspect the product to determine whether it was defective and to allow the seller an opportunity to cure the breach." *Id.* at 424. The seller or manufacturer must be "made aware of a problem with a particular product purchased by a particular buyer." *U.S. Tire–Tech, Inc.*, 110 S.W.3d at 202. Proper notice "opens the way for normal settlement

through negotiation," TEX. BUS. & COM. CODE § 2.607 cmt. 4, and it is judged according to "the reasonableness of the efforts by the wronged party to communicate his dissatisfaction with the tendered performance, considering all the circumstances," *Reynolds Metals Co. v. Westinghouse Elec. Corp.*, 758 F.2d 1073, 1078 (5th Cir.1985). The Fifth Circuit instructs that the notice provisions under § 2.607 "are not stringent and are liberally construed by the Texas courts." *Reynolds Metals Co.*, 758 F.2d at 1078 (citing *Vintage Homes, Inc. v. Coldiron*, 585 S.W.2d 886, 889 (Tex.Civ.App.— El Paso 1979, no writ)).

The court is persuaded that there is a fact issue whether Nucor received the kind of notice required by Texas law. Enpro states that it relied upon Namasco to communicate Enpro's "general expression of. . .dissatisfaction with the product," *see U.S. Tire–Tech, Inc.*, 110 S.W.3d at 201, and it produces some evidence from which a trier of fact might infer that Nucor was informed of the relevant details of the situation with the steel plate.[62] An April 30, 2000, internal Namasco memorandum from the account manager to another employee described the problem, named Enpro and the particular piece of steel plate at issue, and mentioned initiating a claim with Nucor.[63] A May 16, 2002, e-mail from Jeffrey Whiteman of Nucor to the Namasco employee directed to contact Nucor refers to "our conversation regarding the two claims submitted" and identifies the steel plate by Nucor's internal order number.[64] Whiteman recalls hearing of the

---

**59.** See Plaintiff Enpro Systems, Ltd.'s Motions for Summary Judgment, Docket Entry No. 42, pp. 13–14.

**60.** Defendant Nucor Corporation's Motion for Summary Judgment, Docket Entry No. 47, pp. 5–7.

**61.** Enpro System, Ltd.'s Opposition to Defendant Nucor Corporation's Motion for Summary Judgment, Docket Entry No. 52, pp. 7–12.

**62.** *See id.* at 9–12.

**63.** April 30, 2002, Memorandum from Tizzy Hillhouse to George McHale, Exhibit F, attached to Enpro System, Ltd.'s Opposition to Defendant Nucor Corporation's Motion for Summary Judgment, Docket Entry No. 52.

**64.** May 16, 2002, E-mail from Jeff Whiteman to George McHale, Exhibit G, attached to Enpro System, Ltd.'s Opposition to Defendant

situation on April 30, 2002.[65]

There is no direct evidence that Nucor knew Enpro by name, but such information was easy enough to attain from Namasco if Nucor did not actually learn of it in its communications with Namasco about the claim. Under the liberal Texas standard, this may be sufficient to constitute reasonable notice; certainly, Nucor knew where to turn if it wanted to inspect the allegedly defective material.[66]

The court is not persuaded by Nucor's argument that late notice robbed it of an opportunity to cure. Nucor argues that even if it received some notice of the dispute from Namasco on April 30, 2002, that was still eleven days after removal and scrapping of the defective steel plate.[67] But the only option that this delay deprived Nucor of was the option of offering Enpro the replacement steel that would be used on the fabrication of the new vessel.[68] The court fails to see how this materially harmed Nucor's position. Whether Nucor supplied the actual steel for the replacement vessel, or offered equivalent credit for future purchases, or reimbursed Enpro

for the purchase price of the plate, Nucor would be responsible for the same amount: the value of the defective steel. The latter two options remained even after Enpro replaced the steel on its own, and in fact, Nucor offered to satisfy the claim for "the value of the plate—1 pc." [69] The dispute in this case really centers on consequential damages. Nucor has not explained how any damages it may ultimately owe Enpro in this regard might have been avoided had it received notice earlier.[70]

The court concludes that Nucor is not entitled to summary judgment for failure to receive proper notice under the Texas UCC.

### 3. Nucor's Attempted Disclaimer of Warranties

Nucor argues that the terms contained in its invoice to Namasco, as well as industry custom and practice, effectively disclaimed implied warranties as to Enpro.[71] Enpro responds that Nucor did not provide Enpro those terms with the MTRs or otherwise and again relies on the Painter statement distinguishing products with hidden defects to challenge the usage of trade claim.[72] Nucor disputes Enpro's po-

Nucor Corporation's Motion for Summary Judgment, Docket Entry No. 52.

65. Affidavit of Jeffrey T. Whiteman, Exhibit 1, attached to Defendant Nucor Corporation's Motion for Summary Judgment, Docket Entry No. 47.

66. Enpro System, Ltd.'s Opposition to Defendant Nucor Corporation's Motion for Summary Judgment, Docket Entry No. 52, p. 12. Enpro states that the parties have postponed depositions of Nucor pending the court's rulings on the summary judgment motions.

67. Defendant Nucor Corporation's Motion for Summary Judgment, Docket Entry No. 47, p. 7.

68. Nucor states: "By April 19, 2002, the replacement plate had been purchased (from someone other than Nucor), cut, formed, rolled, and otherwise prepared to the point that installation was under way." Id. at 6.

69. See May 16, 2002, E-mail from Jeff Whiteman to George McHale, Exhibit G, attached to Enpro System, Ltd.'s Opposition to Defendant Nucor Corporation's Motion for Summary Judgment, Docket Entry No. 52.

70. See Defendant Nucor Corporation's Motion for Summary Judgment, Docket Entry No. 47, pp. 5–7.

71. Id. at 7–9; Memorandum of Law in Support of Defendant Nucor Corporation's Response to Plaintiff Enpro Systems, Ltd.'s Motion for Summary Judgment, Docket Entry No. 61, pp. 2–4.

72. See Enpro System, Ltd.'s Opposition to Defendant Nucor Corporation's Motion for Summary Judgment, Docket Entry No. 52, pp. 12–13.

sition that the defects were not detectable upon delivery.[73]

■ Nucor cannot rely on terms contained in an invoice to Namasco to disclaim implied warranties to third parties like Enpro. A party may disclaim implied warranties through conspicuous writings.[74] Tex. Bus. & Com. Code § 2.316(b). The purpose of the conspicuousness requirement, according to the code's commentary, is to "protect the buyer from unexpected and unbargained language of disclaimer" and "from surprise." See id. § 2.316 cmt. 1. Enforcing invoice terms against a party not involved in the transaction represented by the invoice and who never saw it would empty the term "conspicuous" of any meaning.

In Clark v. DeLaval Separator Corp., 639 F.2d 1320 (5th Cir.1981), the Court held that a manufacturer could not rely on a retailer's warranty disclaimer to insulate itself from liability, because the retailer's disclaimer "would not, and ought not be deemed to, give a reasonable person (buyer) notice that the manufacturer was also disclaiming any implied warranties." Id. at 1323–24. Application of such a disclaimer to the manufacturer "might very well surprise a remote buyer." Id. at 1324. The principle applies to the instant case: An invoice sent by one party to another cannot reasonably be held to alert third parties to terms contained therein, much less that they are bound by those terms.

The Clark court appeared careful to suggest that there were ways in which a remote manufacturer could properly disclaim warranties. It might include terms in materials accompanying the product or require its distributors to include manufacturer-specific disclaimers in their own contracts with buyers. See id. The Fifth Circuit later held that Clark did not apply in situations involving component manufacturers and remote purchasers of a whole product, noting the inapplicability of these disclaimer methods to that context. See Hininger v. Case Corp., 23 F.3d 124, 129 (5th Cir.1994). Since the steel plate at issue here was not a component of a larger product when Enpro received it from Namasco, Nucor falls squarely under the Clark doctrine. And as Enpro argues, Nucor might have included its warranty disclaimer in the MTRs, but it did not do so.[75]

As to its usage of trade argument, Nucor adds nothing that changes the court's earlier conclusion that the issue is a factual dispute appropriate for trial, not summary judgment. Nucor's argument that the defects in the plate were not latent as a matter of law is unpersuasive. Nucor appears to reason that since the defects were eventually discovered by visual inspection on April 16, 2002, they could have been discovered earlier.[76] Nucor acknowledges that Enpro inspected the steel plates upon receipt and continuously thereafter.[77] Nucor also theorizes that welding of the steel plate at Valero could not have been the cause of the defects suddenly appearing on

---

73. See Defendant Nucor Corporation's Reply to Enpro's Response to Nucor's Motion for Summary Judgment, Docket Entry Nos. 64, 66, pp. 1–3.

74. See Defendant Nucor Corporation's Motion for Summary Judgment, Docket Entry No. 47, p. 7.

75. Enpro System, Ltd.'s Opposition to Defendant Nucor Corporation's Motion for Sum-

mary Judgment, Docket Entry No. 52, pp. 12–13.

76. See Defendant Nucor Corporation's Reply to Enpro's Response to Nucor's Motion for Summary Judgment, Docket Entry Nos. 64, 66, pp. 1–2.

77. Id.

the surface, because those defects extend beyond the "heat affected zone."[78]

At most, Nucor has raised a fact question about latency; it has not demonstrated entitlement to summary judgment on the issue. Enpro president and CEO Painter's sworn declaration that the defects were not discovered until April of 2002 despite Enpro's inspection of the steel "at various stages throughout the fabrication process"[79] is competent record evidence that supports the conclusion that the defects were not, in fact, open and obvious before they arrived at Valero.

Nucor's Motion for Summary Judgment on the basis that its invoice terms and the steel industry's custom and practice effectively disclaimed implied warranties will be denied. Enpro's Motion for Summary Judgment No. 4—that Nucor's warranty disclaimers and limitation of damages disclaimers are not effective as to Enpro (as distinguished from any limitations based on usage of trade)—will be granted.[80]

### 4. Choice of Law

Nucor turns to its invoice to Namasco also to argue that North Carolina law, designated by the invoice terms' choice of law provision, governs the current dispute and bars Enpro's claims.[81] Enpro argues that Texas law applies.[82] The court agrees with Enpro's position.

 Texas courts give effect to parties' contractual choice of law if the jurisdiction whose law is chosen "has a reasonable relationship to the contract and the par-

ties' agreement does not 'thwart or offend the public policy of the state the law of which ought otherwise to apply.'" *Monsanto Co. v. Boustany*, 73 S.W.3d 225, 229 (Tex.2002) (quoting *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex.1990)). The Texas Supreme Court has explained the principle behind allowing parties to choose the applicable law as follows:

> When parties to a contract reside or expect to perform their respective obligations in multiple jurisdictions, they may be uncertain as to what jurisdiction's law will govern construction and enforcement of the contract. To avoid this uncertainty, they may express in their agreement their own choice that the law of a specified jurisdiction apply to their agreement. Judicial respect for their choice advances the policy of protecting their expectations.

*DeSantis*, 793 S.W.2d at 677. The Court stated that the "protection of the justified expectations of the parties" is the "most basic policy of contract law." *Id.*

 It is clear from this summary that the choice of law provision in Nucor's invoice to Namasco is irrelevant to the court's determination of the law applicable to the current case. Respecting a choice of law provision does not protect expectations if at least one of the parties never agreed to the choice. Implicit in the Supreme Court's decision to give effect to choice of law provisions is that such provisions are contained in some kind of agreement or contract *between the disputing*

---

**78.** *See id.* at 2–3.

**79.** Declaration of John R. Painter, at ¶ 10, Exhibit B, attached to Enpro System, Ltd.'s Opposition to Defendant Nucor Corporation's Motion for Summary Judgment, Docket Entry No. 52.

**80.** *See* Plaintiff Enpro Systems, Ltd.'s Motions for Summary Judgment, Docket Entry No. 42, pp. 15–18.

**81.** Defendant Nucor Corporation's Motion for Summary Judgment, Docket Entry No. 47, pp. 9–10.

**82.** See Enpro System, Ltd.'s Opposition to Defendant Nucor Corporation's Motion for Summary Judgment, Docket Entry No. 52, pp. 13–15.

*parties.* Here, if the invoice terms do constitute a contract, it is a contract between Nucor and Namasco, not between Nucor and Enpro. Again, as the court stated earlier, Enpro was not a party to the transaction the invoice represents.

■■■ The Texas code provides that failing a choice of law agreement between the parties "this title applies to transactions bearing an appropriate relation to this state." TEX. BUS. & COM. CODE § 1.301(a). In *Compaq Computer Corp. v. Lapray*, 135 S.W.3d 657 (Tex.2004), the Texas Supreme Court followed the parties' and the trial court's lead in using the "most significant relationship" test to analyze "appropriate relation." *See id.* at 680. That test considers the following factors: (1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the location of the contract's subject matter; and (5) the domicile, residence, place of incorporation, and place of business of the parties. *See id.* The Supreme Court refashioned the test somewhat to apply to the suit before it, a warranty action against a manufacturer by purchasers of computers. *See id.* at 661–62. If what the Supreme Court suggested in *Compaq Computer Corp.* applies in this case—that the first factor is the place of purchase, the second factor is inapplicable, and the third and fourth factors are the place where the product is used—then there is strong indication that the instant transaction bears a significant relationship to Texas. *See id.* at 681. Enpro's purchase of the steel plate, the plate's delivery, and the alleged injury all took place entirely within Texas. Outside of its choice of law argument about North Carolina, Nucor does not dispute that Texas law applies.[83] The transaction has an appropriate relation to Texas.

The Texas code has expressly left it to the courts to decide whether "the buyer or anyone entitled to take advantage of a warranty made to the buyer may sue a third party other than the immediate seller for deficiencies in the quality of the goods." TEX. BUS. & COM. CODE § 2.318. The Texas Supreme Court has held that "privity is not a requirement for a Uniform Commercial Code implied warranty action for economic loss," *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77, 81 (Tex. 1977), and this court expressed above, see supra Part B–1, its view that the Supreme Court would likely take the same position regarding express warranties, as lower courts have already done, *see U.S. Tire–Tech, Inc.*, 110 S.W.3d at 198.

Nucor's Motion for Summary Judgment based on North Carolina law must be denied.

## IV. Conclusions and Order

For the reasons discussed above, Defendant Namasco Corporation's Motion for Summary Judgment (Docket Entry No. 39) is **DENIED**; Plaintiff Enpro Systems, Ltd.'s Motions for Summary Judgment (Docket Entry No. 42) are **GRANTED in part** and **DENIED in part**; and Defendant Nucor Corporation's Motion for Summary Judgment (Docket Entry No. 47) is **DENIED**.

As to Namasco's motion for summary judgment, the court is not persuaded that the delivery ticket/invoice terms constitute part of the contract or that the record demonstrates that the parties' course of dealing or an applicable usage of trade excludes implied warranties. Usage of trade remains a triable fact issue.

Enpro's Motion for Summary Judgment No. 1 is **DENIED**, and Enpro's Motions

---

83. See Defendant Nucor Corporation's Motion for Summary Judgment, Docket Entry No. 47, pp. 9–10.

for Summary Judgment Nos. 2, 3, and 4 are **GRANTED**. The court concludes that regardless of whether the parties had an agreement on July 19, 2001, the disclaimer of warranties, limitation of liability, and other terms contained on the Namasco delivery ticket and invoice are not effective against Enpro. The court also concludes that the Mill Test Report is an express warranty by both Namasco and Nucor and that Nucor's invoice terms are not effective against Enpro. Enpro's Motions for Summary Judgment Nos. 5 and 6—that Namasco's disclaimers are not conspicuous and that Namasco's exclusion of warranties does not disclaim the express warranty—are **DENIED as MOOT**.

The court has considered, but declines to reach for reason that it is moot, Nucor's argument about revocation of acceptance. The court concludes that although Nucor is not entitled to summary judgment, its argument discloses triable fact issues as to whether it received proper notice under Texas law and whether an applicable usage of trade excludes implied warranties. The court concludes as a matter of law, however, that the terms contained in the Nucor invoice to Namasco are not effective as to Enpro and that the law of Texas, not North Carolina, applies to the current case.[84]

The parties are instructed to appear for a scheduling conference on February 25, 2005, at 3:00 p.m., in Court Room 9–B, 9th Floor, United States Courthouse, 515 Rusk Avenue, Houston, Texas.

---

84. The court has allowed the parties considerable leeway in submitting numerous papers in connection with the pending motions. As the length of this Memorandum and Order indicates, the court has expended considerable time reading these papers and performing a significant amount of independent research to be as fully informed as possible when addressing the parties' arguments. While, because of the sheer volume of information presented, it is not impossible that some arguments were overlooked, the parties should assume that failure to expressly address a particular argument in this Memorandum and Order reflects the court's judgment that the argument lacked sufficient merit to warrant discussion. Accordingly, the court strongly discourages the parties from seeking reconsideration based on arguments they have previously raised or that they could have raised.